| | | | |
|---|---|---|---|
| **SUCCESSION OF LAURIE MARIA BROCATO** | * | **NO. 2024-CA-0600** | |

*

**COURT OF APPEAL**

*

**FOURTH CIRCUIT**

*

**STATE OF LOUISIANA**

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2022-02121, DIVISION "E"
Honorable Omar Mason, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)


Robert Thomas Garrity, Jr.
Pierre W. Mouledoux
THE LAW OFFICE OF ROBERT T. GARRITY, JR.
615 Hickory Avenue
Harahan, LA 70123

      COUNSEL FOR PLAINTIFF/APPELLANT


Edward John Lilly
CRULL, CASTAING & LILLY
1217 Coliseum Street
New Orleans, LA 70130

      COUNSEL FOR APPELLEE


**AFFIRMED**
**FEBRUARY 26, 2025**

This appeal arises out of a dispute over the validity of an olographic testament. Appellants, Brandon Glorioso ("Mr. Glorioso") and Barbara Brocato Duvall ("Ms. Duvall") (collectively, "Appellants"), seek to appeal the district court's June 17, 2024 judgment, which granted Appellee's, Lisa Vickers ("Ms. Vickers"), *Petition to Revoke and Annul Probated Testament Dated November 4, 2019*; ordered that the order probating the November 2019 will and the appointment of Mr. Glorioso as Dative Administrator be annulled; and accepted the olographic testament of Laurie Maria Brocato, dated January 21, 2021, February 1, 2021, and February 2, 2021 for probate. For the reasons that follow, we affirm the district court's judgment.

## FACTS AND PROCEDURAL HISTORY

Laurie Maria Brocato ("Decedent") died on October 5, 2021. On March 14, 2022, Decedent's nephew, Mr. Glorioso, filed a *Petition to Probate Olographic Testament and Appointment of Dative Independent Executrix*, seeking to have an olographic testament of Decedent's, dated November 4, 2019, probated and to have his mother and Decedent's sister, Ms. Duvall, appointed as the dative independent executrix of Decedent's estate. On the same day, the district court

ordered that the November 4, 2019 testament be recorded, filed, and executed by its terms. Ms. Duvall was appointed as the executor of Decedent's estate on March 22, 2022. However, on April 7, 2022, Mr. Glorioso replaced Ms. Duvall as the executor of Decedent's estate due to personal health reasons.

On June 28, 2022, Decedent's surviving spouse, Ms. Vickers, filed a *Petition to Revoke and Annul Probated Testament Dated November 4, 2019, to Revoke Appointment of Brandon Glorioso as Dative Testamentary Executor, in Due Course to Probate Olographic Testament Dated January 31, 2021, February 1, 2021, and February 2, 2021, and to Appoint Administratrix* (the "petition to revoke"). The petition to revoke sought to have the November 4, 2019 testament revoked, to have Mr. Glorioso removed as executor and replaced by Ms. Vickers, and to have a subsequent testament dated on three consecutive days—January 31, 2021, February 1, 2021, and February 2, 2021—probated as Decedent's last will and testament. This testament was written on consecutive pages in a bound notebook. The petition to revoke was originally set for a summary hearing on November 18, 2022. However, on November 11, 2022, Mr. Glorioso filed an unopposed motion for continuance, which was granted on November 18, 2022, and the hearing was continued and reset without date.

On May 2, 2023, Mr. Glorioso filed a motion to reset, seeking to have the district court order a resetting of Ms. Vickers' rule to show cause, with testimony, why Decedent's November 4, 2019 testament should not be revoked and why he should not be removed and replaced as the executor. After multiple continuances, on August 28, 2023, the district court ordered that the hearing on the petition to revoke was set for October 30, 2023. Due to issues with service of the petition to revoke on all legatees named in the November 4, 2019 testament, the hearing was

2

again continued until March 5, 2024. Although any further requests for a continuance are absent from the record, the bench trial on the petition to revoke ultimately commenced on April 30, 2024.

At the April 30, 2024 hearing, several witnesses testified. First, Ms. Vickers testified as to her relationship with Decedent as well as Decedent's health history and the circumstances surrounding Decedent's death. Ms. Vickers also provided testimony that the testament at issue in this appeal was written and signed in the hand of Decedent. Specifically, Ms. Vickers testified that she recognized the handwriting and signature as Decedent's based on the following:

> She was always writing in notebooks, in journals . . . . Sometimes she practiced her handwriting. She'd do her signature—just a whole page full of her signatures. She would write on the back of the scrap of paper. She was always writing notes as she went through the house, grocery lists—you know—all kinds of things. Notes to me, cards.

As to Decedent's signature specifically, Ms. Vickers testified that "[s]he had a very specific signature."

Next, Adele Thonn, who was qualified as a handwriting expert and forensic document examiner, testified that, after considering Decedent's writing samples that she was given, there was a "strong probability" that the testament was drafted by Decedent. Ms. Thonn explained that the term "strong probability" is a technical term in the field of handwriting analysis and is the second highest opinion, meaning that the evidence is very persuasive and "the examiner is virtually certain that the questioned and the known documents were written by the same person."

Following, Douglas Bourgeois, a decades-long friend of Decedent, also provided testimony in support of the handwriting in the testament belonging to Decedent. While Mr. Bourgeois did not testify as to Decedent's signature, he testified that the testament at issue was unequivocally written in her handwriting.

3

Mr. Bourgeois relayed that he believed the testament was written in Decedent's handwriting "[b]ased on the handwriting [he] had in [his] own cards—you know—cards and letters [from Decedent]. And just the general way she wrote . . . the way she did capital L's and capital M's."

The remaining two witnesses, James Duvall ("Mr. Duvall") and Mr. Glorioso, testified as to the acquiring of one of Decedent's previously written testaments. Mr. Duvall provided that Decedent had given him an envelope containing a will, which he was instructed to deliver to his wife, Ms. Duvall, who then gave it to Mr. Glorioso. Mr. Duvall testified that he never saw the contents of the envelope until the proceedings in this matter began. Likewise, Mr. Glorioso testified that he had been given the envelope from his mother, which he then placed inside of his own blue envelope. Mr. Glorioso stated that he did not open the envelope from his mother until after Decedent passed away and Ms. Duvall reminded him that he had them. At the conclusion of the hearing, the district court judge requested that each party file a post-trial memorandum, both of which were filed on May 23, 2024.

On June 17, 2024, the district court rendered its written judgment, granting Ms. Vickers' petition to revoke; annulling the order that probated the November 4, 2019 testament and appointed Mr. Glorioso as executor; and accepting for probate the January 31, 2021, February 1, 2021, and February 2, 2021 testament. The district court also provided extensive written reasons for judgment on the same day. Specifically, the district court found that Decedent's January 31, 2021, February 1, 2021, and February 2, 2021 testament complied with the date requirements, the signature requirement, and the hand writing requirement for an

4

olographic testament. Appellants filed a motion for appeal on April 30, 2024, which was granted on July 2, 2024. This timely appeal followed.

## DISCUSSION

Appellants raise only one assignment of error: the district court erred in holding the alleged latest dated olographic testament of Decedent as statutorily valid. Before addressing the merits of this appeal, we begin our discussion setting forth the standard of review, burden of proof and applicable law.

*Standard of Review*

"Absent a finding of manifest error, in will contest cases, the factual findings of the [district] court are accorded great weight and will not be disturbed on appeal." *Succession of McKlinski*, 21-0369, p. 3 (La. App. 4 Cir. 11/10/21), 331 So.3d 414, 416, *rev'd on other grounds* (quoting *In re Succession of Caillouet*, 05-0957, p. 4 (La. App. 4 Cir. 6/14/06), 935 So.2d 713, 715).

*Burden of Proof*

"The proponent of an olographic will has the burden of proving that it was entirely written, dated and signed by the testator." *Caillouet*, 05-0957, p. 3, 935 So.2d at 715 (citing La. C.C.P. art. 2903). Specifically, "[t]he olographic testament must be proved by the testimony of two credible witnesses that the testament was entirely written, dated, and signed in the testator's handwriting." La. C.C.P art. 2883. "The court must satisfy itself, through interrogation or from the written affidavits or the depositions of the witnesses, that the handwriting and signature are those of the testator, and except as provided in Article 2890,[1] must mention these facts in its proces verbal." La. C.C.P art. 2883.

---

[1] Louisiana Code of Civil Procedure article 2890 provides, in pertinent part:

5

*Applicable Law*

"There are two forms of testaments: olographic and notarial." La. C.C. art. 1574. Louisiana Civil Code article 1575 describes the formality requirements for a valid olographic testament:

> A. An olographic testament is one entirely written, dated, and signed in the handwriting of the testator. Although the date may appear anywhere in the testament, the testator must sign the testament at the end of the testament. If anything is written by the testator after his signature, the testament shall not be invalid and such writing may be considered by the court, in its discretion, as part of the testament. The olographic testament is subject to no other requirement as to form. The date is sufficiently indicated if the day, month, and year are reasonably ascertainable from information in the testament, as clarified by extrinsic evidence, if necessary.
>
> B. Additions and deletions on the testament may be given effect only if made by the hand of the testator.

With regard to the date, La. C.C. art. 1575 "does not require that an olographic will be written in its entirety on the same date . . . ." *Caillouet*, 05-0957, p. 4, 935 So.2d at 715 (citing *Succession of Smart*, 214 La. 63, 68 (La. 1948)). Further, "extrinsic evidence can be admitted to clarify an ambiguous date . . . ." *Cf. In re Succession of Duskin*, 14-0236, p. 6 (La. App. 4 Cir. 11/19/14), 153 So.3d 567, 573 (citation omitted) (where this Court held that, although extrinsic evidence can be utilized for date clarification, "when the testament contains no date at all in the handwriting of the testator, a date cannot be inferred"); *In re Succession of Aycock*, 02-0701 (La. 5/24/02), 819 So.2d 290 (where the Louisiana Supreme Court held that "[w]hile extrinsic evidence may be allowable in some circumstances to clarify an ambiguity, when the testament contains no date at all in the handwriting of the

---

B. If written affidavits only are used to prove a will under Articles 2883 through 2887, the proces verbal shall be dispensed with, and the court shall render a written order that the testament be recorded, filed, and executed, if the court finds that it has been proved in accordance with law, or a written order refusing to probate the testament, giving the substance of the court's reasons therefor.

testator, a date cannot be inferred"). As to the signature, this Court has noted that "the sole object of a signature is the identification of the testator, and that any signature that will identify the testator as the author of the testament will suffice." *Caillouet*, 05-0957, p. 5, 935 So.2d at 716 (citing *Succession of Cordaro*, 126 So.2d 809, 813 (La. App. 2d Cir. 1961)).

"Under Louisiana law, there is a presumption in favor of the validity of testaments in general and proof of the nonobservance of formalities must be exceptionally compelling to rebut that presumption." *Succession of Armstrong*, 93-2385 (La. App. 4 Cir. 4/28/94), 636 So.2d 1109, 1111. Moreover, "[w]hen a testament is written in olographic form without the aid of counsel, the intention of the testator is to be given paramount importance." *Caillouet*, 05-0957, p. 5, 935 So.2d at 716 (citing *Succession of Diaz*, 617 So.2d 34, 37 (La. App. 4th Cir. 1993)). "Because Louisiana law favors maintaining the validity of testaments, courts liberally construe the requirements, maintaining the validity of the will if at all possible, as long as it is in substantial compliance with the statute." *Succession of Martin*, 22-1370, p. 5 (La. App. 1 Cir. 6/2/23), 370 So.3d 37, 40-41 (citing *In re Succession of Holbrook*, 13-1181, p. 8 (La. 1/28/14), 144 So.3d 845, 851). Having discussed the relevant law, we now turn to Appellants' sole assigned error.

*Validity of Decedent's Last Dated Testament*

Appellants argue that because Decedent's signature does not appear at the very end of the testament, but rather at the top of the second of four pages, that renders the testament invalid in form. Appellants also assert that the testament contains conflicting dates on the second page of the testament, which creates uncertainty and invalidates the testament. Conversely, Ms. Vickers argues that she provided sufficient proof that the January 31, 2021, February 1, 2021, and

February 2, 2021 testament was written, signed and dated in the hand of Decedent. Specifically, Ms. Vickers asserts that the dates on the testament are not ambiguous and that the district court properly exercised its discretion in considering writings after Decedent's signature. Noteworthy is the fact that there are no issues in this appeal pertaining to whether the testament was written by Decedent. Rather, this issue focuses solely on the form requirements of date and signature for a valid olographic testament, which we will address separately.

*The Date*

The testament at issue in this appeal consists of four consecutive pages from a composition notebook. It is uncontested in this case that the first page is dated January 31, 2021, and the third and fourth pages are each dated February 2, 2021. The date at issue is found on the second page of the testament—there are two dates written on this page. At the top of the second page, it appears that the date is written as "2/1/2021." The Appellant asserts that the "2" representing the month of February was actually a "1" with a "2" subsequently written over it. The handwriting expert testified at the hearing that she would not consider the discrepancy to be an overwriting, but rather a patching. When asked to clarify what that terminology meant, she provided, "[m]eaning correcting a mistake . . . . It could also be a malfunctioning pen, or it could be that there's a lack of fine motor control, and so the writing is kind of smeared a little bit." The district court, in its reasons for judgment, found that "[t]he alleged 1 the [Appellants] point[] out under the 2 is barely noticeable; it is a light scratch." We agree. From our review of the second page of the testament, the "2" is clearly written without any ambiguity, making the correct date "2/1/2021."

The second date on page two is written in the left margin as "2/2/2012." The district court found that this date, taken in context with the dates on the other three pages, as well as the "2/1/2021" date on the same page, was "clearly an error and does not reflect the testator's intent as to the date of this olographic will . . . ." In considering whether the district court abused its discretion in coming to this conclusion, we note that there exists "a strong public policy of the State to sustain the validity of the will and give effect to the testator's wishes whenever possible." *Succession of Roniger*, 97-1088, p. 4 (La. App. 4 Cir. 1/14/98), 706 So.2d 1025, 1027 (citing *Succession of LaBarre*, 179 La. 45, 48, 153 So. 15, 16 (La. 1934)). Considering the consecutive dates on the four pages of the testament, and the simple switching of the numbers from "2012" to "2021," we do not find that the district court erred by concluding that this mistake by the testator does not render the date uncertain so as to invalidate the testament. This argument is unpersuasive.

*The Signature*

We begin by noting that Appellants rely on *Succession of Ally* for the proposition that Decedent signing at the end of a testament is imperative for upholding testamentary intent and ensuring that mere drafts of testaments are not probated. 22-0016 (La. App. 5 Cir. 12/31/22), 354 So.3d 1248. In *Ally*, the decedent drafted an olographic testament which began with the date, and was followed by "I Ruth Ally a resident of Metairie . . . ." *Id.* at p. 1, 354 So.3d at 1249. That was the only location wherein the decedent signed her testament. In discussing the same concern asserted by Appellants as to purported drafts of testaments being probated, the appellate court noted that the testator's signature being at the end of the testament signifies that the testator is satisfied with the dispositions contained therein, whereas a signature at the commencement of the

testament only indicates that the process of drafting the testament has begun. Because of the placement of the decedent's signature immediately at the beginning of the testament, before any dispositions had been made, the appellate court found that the testament did not satisfy the requirements found in La. C.C. art. 1575. Comparing *Ally* to the matter *sub judice*, the two cases are readily distinguishable.[2] In the instant matter, Decedent also begins her testament with the date—January 31, 2021—and then starts by writing, "I, Laurie Marie Brocato. . . ." However, at the bottom of the first page of the testament, she makes dispositions to Ms. Vickers of both her home and her fifty percent interest in a Mercedes vehicle. Decedent's signature appears at the top of the second page, which is after the dispositions have already begun. Because the *Ally* court based its decision on the fact that there was no signature following any of the dispositions in that testament, we find this case to be inapposite and unpersuasive as it fails to render Decedent's testament invalid.

Appellants further assert that the district court erred in relying on *Succession of Enos* in its written reasons for judgment. 20-0329 (La. App. 3 Cir. 12/16/20), 310 So.3d 236. In *Enos*, the sole issue was the location of the decedent's signature in the testament. Similar to the matter before us, the *Enos* decedent's testament was found in a spiral notebook and spanned two pages. The first page consisted of the decedent's wishes that her property be equally divided among her children and that her husband had the right to live in her home until his remarriage or death. The decedent's signature was found on the first line of the second page. Following the signature, the decedent included further descriptions of the property that was to be divided among her children. The appellate court found that the decedent's

---

[2] We note that this Court is not bound by opinions published by other Louisiana appellate courts. *See Marchand v. Asbestos Defendants*, 10-0476, p. 7 (La. App. 4 Cir. 11/10/10), 52 So.3d 196, 200 (wherein this Court held that it is "not bound by decisions of other circuits").

10

signature located at the top of the second page, rather than at the bottom of the first page, did not invalidate the testament. Appellants argue that, because only two dispositions precede Decedent's signature in the instant matter with several more dispositions following the signature, the testament is invalid. We note that the testament in *Enos* did not have additional dispositions after the signature, but rather a specific list of the property already bequeathed to her children. This is dissimilar from the instant testament where there are dispositions made before and after Decedent's signature. However, in discussing *Enos*, the district court merely noted that the similarities of the two testaments were that both were written in notebooks and were signed at the top of the second page with more language following the signature. The district court did not state that each contained more dispositions after the signature. Thus, the district court recognized that the *Enos* testament was valid despite the signature not appearing at the end of the testament. We do not find that the district court erred in relying on *Enos* for the proposition that language after a signature can be considered by the court.

The contested testament at issue here includes one signature and two sets of initials. As noted above, it is not disputed in this appeal that the signature and initials were in the handwriting of Decedent. Rather, the issue centers around the location of the signature in the testament and whether that location meets the form requirements of La. C.C. art. 1575. To revisit the previously cited law, La. C.C. art. 1575 provides, as to signatures, that "the testator must sign the testament at the end of the testament. If anything is written by the testator after his signature, the testament shall not be invalid and such writing may be considered by the court, in its discretion, as part of the testament." The text of the article specifically provides that the signature not being at the end of the testament does not invalidate the

testament. The revision comments to La. C.C. art. 1575 provide that "[t]he 2001 amendment is intended to legislatively overrule *Succession of King*, 595 So.2d 805 (La. App. 2 Cir. 1992), which held that in an olographic testament the signature should be at the end of the testament." The language of the code article itself combined with the intent provided in the revision comment leads us to conclude that the signature being located at the end of the testament is not of paramount importance in meeting the form requirements for a valid olographic testament. In choosing to consider the language of the testament which followed the signature, the district court exercised the great discretion given to it by the Civil Code. Another factor that we find supports the district court's decision to find this testament valid is the inclusion of Decedent's initials in two subsequent locations of the testament. The first set of initials appear on page two in the left-hand margin, and the second set of initials appear at the top of the third page of the testament. Decedent's continued initialing of the testament after her signature convinces us that she was intending to write this testament as one document, although drafted over several days. We find no error in the district court's decision to give Decedent's intent paramount importance based upon the presented testament in this matter. *See Caillouet*, 05-0957, p. 5, 935 So.2d at 716. This argument is unpersuasive.

## DECREE

For the aforementioned reasons, we affirm the district court's June 17, 2024 judgment.

**AFFIRMED**